UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
*West Palm Beach Division*
www.flsb.uscourts.gov

In re:

CASALE MARBLE IMPORTS, INC.,                    Case No.   08-19689-BKC-PGH
                                                Chapter 11 Case

            Debtor.

_____/


## FIRST AMENDED DISCLOSURE STATEMENT FOR
## DEBTOR'S  FIRST AMENDED PLAN OF REORGANIZATION


Dated June 30, 2010                    PAUL L. ORSHAN, P.A.
                                       2506 Ponce de Leon Boulevard
                                       Coral Gables, Florida  33134
                                       TEL: 305/529-9380
                                       FAX: 305/402-0777
                                       *paul@orshanpa.com*


                                       Counsel for Debtor and
                                       Debtor-In-Possession


## IMPORTANT:

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR
UPON YOUR DECISION TO ACCEPT OR REJECT THE PROPOSED PLAN OF
LIQUIDATION.  ACCORDINGLY, PLEASE READ THIS DOCUMENT WITH CARE.**


1

## TABLE OF CONTENTS

|  | Page |
|---|---|
| INTRODUCTION | 4 |
| Generally. | 4 |
| Purpose and Disclaimers | 4 |
| EXECUTIVE SUMMARY OF THE PLAN | 6 |
| Introduction | 6 |
| Summary of Classes in the Plan and Treatment of Claims and Interests | 6 |
| CONFIRMATION HEARING | 11 |
| THE DEBTOR | 12 |
| Background and Current Business Operations | 12 |
| Commencement of the Chapter 11 Case | 16 |
| Appointment of Official Committee of Unsecured Creditors | 16 |
| First Day Orders | 16 |
| VOTING PROCEDURES AND REQUIREMENTS OF CONFIRMATION | 19 |
| Creditors and Interest Holders Entitled to Vote | 19 |
| Definition of Impairment | 19 |
| Votes Required for Class Acceptance | 20 |
| Information on Voting Ballots | 20 |
| CONFIRMATION OF THE PLAN | 20 |
| Confirmation Hearing | 20 |
| Requirements for Confirmation of the Plan | 21 |
| Cramdown | 23 |
| SUMMARY OF THE PLAN | 24 |
| Introduction | 24 |
| Classifications of Claims and Interests | 24 |
| Treatment of Unclassified Claims | 24 |
| Administrative Claims | 24 |
| Priority Tax Claims | 25 |
| United States Trustee's Fee | 26 |
| Treatment of Classified Claims | 26 |
| Class 1. Allowed Priority Claims | 26 |
| Class 2. Allowed RBC Secured Claim | 26 |
| Class 3. Allowed Unsecured Claims | 3 |
| Class 4. Allowed Interests | 28 |
| Implementation of the Plan | 28 |
| Transfer and Vesting of Property of the Estate | 28 |
| Resignation and Removal of Disbursing Agent | 28 |
| Disputed Claims Fund | 29 |
| Indemnity of Disbursing Agent | 28 |
| Miscellaneous | 30 |

Preservation of Claims and Causes of Action.................................................................. 30
Injunction and Other Limitations of Liability................................................................. 33
    Applicability of Injunction/Stay as to Reorganized Debtor's Assets of Estate..... 33
Alternatives to the Plan................................................................................................... 34
Tax Analysis .................................................................................................................. 35
    In General.................................................................................................................. 35
    Tax Consequences To Holders Of Claims................................................................. 35
    Consideration Allocable To Interest ......................................................................... 36
    Consideration Allocable to Principal ........................................................................ 36
    Importance of Obtaining Independent Professional Tax Assistance ..................... 36
Liquidation Analysis ...................................................................................................... 37
Risk Factors ................................................................................................................... 37
    Introduction............................................................................................................... 37
    Bankruptcy Risks...................................................................................................... 38
    Risks Relating to Confirmation ............................................................................... 38
    Other Bankruptcy Risks........................................................................................... 38
Exemption from Stamp or Similar Taxes ....................................................................... 39

CONCLUSION................................................................................................................... 39

EXHIBIT A -- Plan of Reorganization

EXHIBIT B – Reorganized Debtor's Projections

EXHIBIT C – Liquidation Analysis

EXHIBIT D – List of Payments Within 90 Days of Petition Date

EXHIBIT E – List of Insider Payments Within 1 Year of Petition Date

## I.  INTRODUCTION

### A.    Generally.

Casale Marble Imports, Inc. (the "Debtor") has proposed its First Amended Plan of Reorganization (the "Plan") under Chapter 11 of the United States Bankruptcy Code. A copy of the Plan is attached hereto as **Exhibit A**. Creditors have the opportunity to vote to accept or reject the Plan. The Plan is summarized in this First Amended Disclosure Statement ("Disclosure Statement"). Notwithstanding such summary, holders of Claims and Interests are urged to refer to the Plan for a full and complete statement of its specific terms, including the treatment proposed to the various Classes of Claims and Interests. All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan.

This Disclosure Statement is being distributed by the Debtor to those creditors and holders of Interests who are entitled to consider and vote on the Plan as set forth herein. After notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing such information as would enable a hypothetical, reasonable investor typical of the holders of Claims and Interests being solicited herein to make an adequately informed judgment in exercising such holder's right to vote either to accept or to reject the Plan. The Bankruptcy Court's approval of this or any other Disclosure Statement does not constitute a determination by the Bankruptcy Court as to the merits of the Plan or whether any creditor or holder of an Interest should vote to accept or reject the Plan. Each holder of a Claim or an Interest should consult with a lawyer and/or other professional advisors in order to obtain specific advice on how the Plan will affect their respective rights.

A separate ballot for use by holders of Claims for indicating acceptance or rejection of the Plan is enclosed with this Disclosure Statement.

**THE DEBTOR BELIEVES THAT THE PLAN OF REORGANIZATION PROPOSED HEREIN IS IN THE BEST INTERESTS OF ALL CREDITORS. AS SUCH, THE DEBTOR STRONGLY URGES ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN BY NO LATER THAN 5:00 P.M., EASTERN TIME, ON THE DATE SET FORTH IN THE ORDER APPROVING THE DISCLOSURE STATEMENT, WHICH IS THE VOTING DEADLINE SET BY THE BANKRUPTCY COURT.**

### B.    Purpose and Disclaimers.

The purpose of this Disclosure Statement is to set forth information (i) regarding the history of the Debtor, its business and the events that have occurred in this Chapter 11 Case, (ii) concerning the Plan and any alternatives to the Plan, (iii) advising the holders of Claims and Interests of the treatment of their respective Claims and Interests proposed under the Plan, (iv) advising the holders of Claims and Interests of their respective rights under the Plan, and (v) assisting the holders of Claims in making informed judgments regarding whether to accept or reject the Plan.  The information in this Disclosure Statement may bear on your decision to vote to accept or reject the Plan. As such, you are urged to read the Disclosure Statement and the Plan carefully and to consult

4

your lawyer and other professional advisors in connection therewith. The contents of the Disclosure Statement should not be construed as legal, business or tax advice from the Debtor or its counsel.

The information contained in this Disclosure Statement (including the Exhibits hereto) concerning the financial condition of the Debtor is based upon financial and other information as of the date hereof. The information in this Disclosure Statement has been obtained from the Debtor, the Debtor's books and records and pleadings and other filings with the Bankruptcy Court, including without limitation, the Debtor's bankruptcy Schedules, proofs of claims filed by creditors, and the monthly financial reports filed by the Debtor during this Chapter 11 Case (the "Monthly Operating Reports"). The Debtor's books and records have not been audited. As such, the Debtor cannot verify the complete accuracy thereof. However, the Debtor is not aware of any material misstatements or omissions in this Disclosure Statement. Any representations made to secure the acceptance or rejection of the Plan which are other than as contained in this Disclosure Statement have not been approved by the Bankruptcy Court. No representations concerning the financial condition of the Debtor or any aspect of the Plan are authorized by the Debtor except as set forth in this Disclosure Statement. If and to the extent that any such representations have been made to any creditor or party in interest, then such representations should be reported to counsel to the Debtor or to the Office of the United States Trustee. Any such representations or inducements made to secure your acceptance or rejection of the Plan, other than as set forth herein, should not be relied upon by you in deciding whether to accept or reject the Plan.

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DOCUMENT UNLESS ANOTHER DATE IS SPECIFIED HEREIN AND THE DELIVERY OF THIS DOCUMENT DOES NOT IMPLY THAT THERE HAVE BEEN NO CHANGES IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE.**

**THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST. THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN. THE PLAN IS THE OPERATIVE CONTROLLING LEGAL DOCUMENT. AS SUCH, IF THERE IS ANY INCONSISTENCY BETWEEN THE TERMS AND PROVISIONS OF THIS DISCLOSURE STATEMENT AND THE PLAN, THEN THE TERMS AND PROVISIONS OF THE PLAN SHALL CONTROL.**

---

**PAUL L. ORSHAN, P.A. COMMENCED REPRESENTATION OF THE DEBTOR IMMEDIATELY PRIOR TO THE PETITION DATE AS ITS BANKRUPTCY COUNSEL AND HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTOR IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT.**

## II. EXECUTIVE SUMMARY OF THE PLAN

### A.   Introduction.

The following is a brief overview and summary of certain material provisions of the Plan. This overview is qualified in its entirety by reference to the Plan, a copy of which is attached hereto as **Exhibit A**, and the Exhibits attached hereto, each as may be amended or modified. Once again, you are urged to review the Plan in detail as it is the operative legal document with respect to the treatment of your Claims and/or Interests and your respective rights in connection therewith. The confirmation of a plan, which is the vehicle for satisfying the rights of holders of claims against and interests in a debtor, is the overriding goal of a Chapter 11 case. The primary objectives of the Plan proposed by the Debtor in this Chapter 11 Case are (i) to continue the Debtor's business through the Reorganized Debtor, (ii) to investigate and pursue, if applicable, all Litigation Claims available to the Debtor, (iii) to review, analyze and, if applicable, object to any Claims and/or Interests filed against or scheduled by the Debtor, (iv) to make Distributions to holders of Allowed Claims pursuant to the terms of the Plan, (v) to otherwise maximize the value of recoveries to all creditors of the Debtor on a fair and equitable basis, and (vi) to close this Chapter 11 Case.

Among other things, the Plan provides for the transfer and vesting of all of the assets of the Debtor into the Reorganized Debtor be held and administered by the Reorganized Debtor for the benefit of all holders of Allowed Claims and Allowed Interests on the Effective Date of the Plan, provided however, that any and all Litigation Claims, if any, shall be retained and enforced by the Reorganized Debtor as a representative of the estate appointed for such purpose, as provided in and pursuant to Section 1123(b)(3) of the Bankruptcy Code solely for the benefit of holders of Allowed Claims and Allowed Interests under the Plan. The Reorganized Debtor shall implement the terms and provisions of the Plan, including without limitation, the investigation and/or pursuit of Litigation Claims, the objection to and resolution of Claims and Interests and the Distributions to holders of Allowed Claims under the Plan. As provided in the Plan, all of the assets and property of the Debtor will be transferred to and vested in the Reorganized Debtor upon and after the Effective Date of the Plan, free and clear of all liens, claims, interests and encumbrances except as specifically provided in the Plan.

### B.   Summary of Classes in the Plan and Treatment of Claims and Interests.

The classification of Claims and Interests under the Plan, the estimated aggregate amount of such Claims and Interests in each such Class, and the amount and type of Distributions proposed to be made holders of Claims or Interests in each Class are summarized in the table below.

The information set forth in the table below with respect to each Class of Claims and Interests is based on the best information available to the Debtor, including from a review of the Debtor's books and records, the bankruptcy Schedules and the proofs of claims that have been filed with the Bankruptcy Court. The Debtor has also provided below an estimated recovery percentage for certain of the Classes of Claims under the Plan. The Debtor anticipates, however, that either it and/or the Reorganized Debtor will object to certain of the Claims asserted against the Debtor and that such Disputed Claims may be material in amount. As a result, depending on the outcome of

6

such objections, the total amount of all Allowed Claims may either be higher or lower than the total amount of Allowed Claims assumed in the Plan. Accordingly, the *pro rata* Distributions that will be made to holders of Allowed Unsecured Claims under the Plan may be adversely or favorably affected by the aggregate amount of Claims allowed in such Class. Further, **Exhibit B** sets forth detailed projections for the life of the Plan which outline in detail the payments set forth in the chart below.

| DESCRIPTION AND AMOUNT OF CLAIMS/EQUITY INTERESTS | TREATMENT OF CLAIMS/INTERESTS |
|---|---|
| Non-Professional Administrative Claims<br><br>• Estimated Amount: $0.00 | The holders of Allowed Administrative Claims against the Estate (with the exception of the Professionals employed pursuant to Sections 327, 503(b)(3) and (4) and 1102 of the Code, who will be paid 100% of the amount allowed of such Administrative Claims by the Bankruptcy Court, upon application to the Bankruptcy Court, prior to the bar date for filing such applications and entry of an order(s) thereon) shall be paid 100% of their Allowed Administrative Claims in Cash, unless otherwise ordered by the Bankruptcy Court, upon the earlier to occur of: (i) the later of the Effective Date or the date of a Final Order allowing such Administrative Claim; or (ii) upon such other dates and terms as may be agreed upon by the holder of any such Allowed Administrative Claim and the Debtor or Reorganized Debtor.<br><br>Each Ordinary Course Administrative Claim shall be paid in full in Cash at the Reorganized Debtors' election either: (a) in accordance with the terms and conditions under which the Claim arose; or (b) on such date on which the holder of the Claim and the Reorganized Debtors agree. Payments shall be made without further action by the holder of the Ordinary Course Administrative Claim.<br><br>• Estimated Recovery Percentage: 100% |

| Allowed Priority Tax Claims<br><br>• Asserted Amount: $0.00 | Each holder of an Allowed Priority Tax Claim under Section 507(a)(8) of the Code shall be paid in full in Cash on the later of (a) the Effective Date (or as soon after that date as practicable) and (b) 30 days after the Claim is Allowed, provided however, that the Debtor or the Reorganized Debtor may elect to pay any Allowed Priority Tax Claim through regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of the Claim, over a period ending not later than five years after the Petition Date, and in a manner not less favorable than the most favored Unsecured Claim provided for by this Plan. If the Debtor or the Reorganized Debtor so elect, the installment payments shall be made in equal quarterly installments of principal plus simple interest on the unpaid portion of the Allowed Priority Tax Claim accruing from the Effective Date at the rate of six percent per year. The first payment shall be made on the latest of: (a) the Effective Date, or as soon after that date as practicable; (b) 30 days after the Claim is Allowed, or as soon after that date as practicable; and (c) another date on which the holder of the Claim and the Debtor or the Reorganized Debtor agree. The Reorganized Debtor retains the right to prepay any Allowed Priority Tax Claim, or any remaining balance of such a Claim, in full or in part, at any time on or after the Effective Date without premium or penalty.<br><br>• Estimated Recovery Percentage: 100% |
| Class 1 - Allowed Priority Claims<br><br>• Asserted Amount: $0.00 | Unimpaired.<br><br>• To be paid in full in Cash on the later to occur of the Effective Date or the date each respective Priority Claim is Allowed by a Final Order.<br><br>• Estimated Recovery Percentage: 100% |

| Class 2 - Allowed Secured Claim of RBC Bank [1] | Impaired. |
|---|---|
| • Asserted Amount: $8,872,228.65 which includes accrued and unpaid interest and pre-petition attorney's fees | The Allowed RBC Secured Claim of $5,067,564.54 (as of June 29, 2010) shall be satisfied in full by the payment of equal monthly installments of principal and interest over a period of 36 months after the Effective Date, which installments will be based upon a seven (7) year amortization and interest at a floating rate of 30-day LIBOR plus five percent (5%), with a balloon at maturity. Such monthly payments shall commence on the first day of the month immediately following the month in which the Effective Date occurs and shall continue thereafter for 35 months, provided the following:

a. Provided all monthly payments are made and the Out-of-Margin position on the Borrowing Base Certificate is reduced to $200,000.00 within the first twelve (12) months, and to $100,000.00 within the first eighteen (18) months, the loan will be extended for an additional six (6) months, at the end of twelve (12) months and eighteen (18) months, respectively.

b. Provided all monthly payments are made during the next six-month period and the Out-Of-Margin position on the Borrowing Base Certificate is reduced to $0.00, the loan will be extended an additional twelve (12) months;

c. At the end of twenty-four (24) months, excess cash will be shared 50/50 between the Debtor and RBC.

d. During Year 3, the Borrowing Base Certificate will remain at $0 and the Debtor will pay RBC (in addition to the regular loan payment) $15,000.00 each month to be applied toward the principal balance.

e. On or before the Effective Date, the Debtor will move all operating accounts to RBC.

f. The unpaid balance of principal, accrued interest and other charges outstanding under the RBC Allowed Secured Claim will be paid in full on the last monthly payment date (the "Maturity Date").

g. RBC shall retain its Liens on the Reorganized Debtor Assets pursuant to and as set forth in the Loan Documents, provided however, that, on the Effective Date, the Reorganized Debtor shall execute and deliver the Restructured Loan Documents consistent with the |

---

1   RBC Bank f/k/a RBC Centura Bank ("RBC").

| | terms of the Plan. |
|---|---|
| | Also on the Effective Date, or as soon as practical thereafter, RBC, the Debtor and the Guarantors shall dismiss without prejudice the RBC Foreclosure Litigation including the Counterclaim. In addition, as of the Effective Date, RBC shall agree to cease prosecuting any and all claims under and pursuant to the Affiliate Guaranty, with all defaults there under being deemed cured as of the Effective Date and with such Affiliate Guaranty being reinstated and confirmed, included as a part of the Restructured Loan Documents. |
| | &bull; Estimated Recovery Percentage: 100% |
| | *See* Exhibit B. |

| Class 3 - Allowed Unsecured Claims | Impaired. |
|---|---|
| • Approximate Asserted Amount: $2,375,671.43 | The holders of Allowed Unsecured Claims shall be satisfied in full by the payment of their pro rata share of $810,000.00 commencing on the first day of the thirty-seventh month following the month in which the Effective Date occurs and continuing on a monthly basis thereafter for a total of thirty-six (36) months. The monthly payments for months 37 to 48 will be $17,500.00. The monthly payments for months 49 to 72 will be $25,000.00. Pursuant to the Projections attached to the Disclosure Statement as Exhibit B, the Debtor estimates the total amount of Allowed Unsecured Claims to equal $2,304,715.87 based on the amount of Unsecured Claims listed in the Schedules. Although, it appears that the asserted amount of Allowed Claims is higher than the original claims of $2,276,291.50 reported on the Schedule F, the Debtor believes this is due to a timing issue. The Debtor was still receiving pre-petition invoices from unsecured creditors as late as four (4) months after the Company filed for Chapter 11 Bankruptcy. Notwithstanding such estimate, the ultimate amount of the Allowed Unsecured Claims may be greater or less than such amount as a result of Objections to Claims that may be filed by the Debtor. Therefore, the final dollar amount of the total Allowed Unsecured Claims may increase or decrease, which will cause the percentage of distribution to increase or decrease accordingly.   Each holder of an Allowed Unsecured Claim shall receive an amount equal to such holder's Pro Rata Share of each such Distribution being made hereunder. All Distributions to holders of Allowed Unsecured Claims hereunder shall be made from Cash on deposit as of the Effective Date and Cash generated by the Reorganized Debtor's operations from and after the Effective Date.<br><br>• Estimated Recovery Percentage: *35%*<br><br>*See* Exhibit B. |
| Class 4 - Allowed Interests | Impaired.<br><br>The holders of Allowed Interests shall retain their ownership interests in the Reorganized Debtor. |

## III.  CONFIRMATION HEARING

The Bankruptcy Court has ordered that holders of Claims against the Debtor entitled to vote on the Plan file ballots for the acceptance or rejection of the Plan directly with the Clerk of the

Bankruptcy Court, 1515 North Flagler Drive, West Palm Beach, Florida 33401 U.S.A., **on or before 5:00 p.m., Eastern Standard Time, on the date established in the Court's Order Approving Disclosure Statement.** Any ballot not filed by such date will not be counted in connection with confirmation of the Plan unless the Bankruptcy Court orders otherwise. A ballot is enclosed herewith for Classes 2, 3 and 4, which Classes are the only Class of Claims or Interests entitled to vote on the Plan. Class 1 is unimpaired and therefore is deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

The Bankruptcy Court has approved this Amended Disclosure Statement and has scheduled a Confirmation Hearing for the Plan on the date and time established in the Court's Order Approving Disclosure Statement, before the Honorable Paul G. Hyman, Chief Judge, U.S. Bankruptcy Court, Flagler Waterview Building, **1515 North Flagler Drive, 8ᵗʰ Floor, West Palm Beach, Florida 33401**, and has directed that notice of the Confirmation Hearing be given to all creditors of the Debtor as well as parties in interest. At the Confirmation Hearing, it is expected that the Bankruptcy Court will enter an order confirming the Plan (the "Confirmation Order") if the requirements of Section 1129(a) of the Bankruptcy Code have been met, including the receipt of sufficient acceptances of the Plan by the holders of Claims against and Interests in the Debtor or, in the alternative, if the requirements of Section 1129(b) of the Bankruptcy Code have been satisfied.

In addition, Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. Any objection to confirmation must be made in writing and filed with the Bankruptcy Court with proof of service and served upon the following persons on or before the date established in the Court's Order Approving Disclosure Statement:

| Paul L. Orshan, Esq. | Heidi A. Feinman, Esq. |
|---|---|
| Paul L. Orshan, P.A. | U. S. Trustee's Office |
| 2506 Ponce de Leon Boulevard | 51 S.W. 1ˢᵗ Avenue, #1204 |
| Coral Gables, FL 33134 | Miami, Florida 33130 |
| *paul@orshanpa.com* | *Heidi.A.Feinman@usdoj.gov* |

Unless an objection to confirmation is timely filed and served, it may not be considered by the Bankruptcy Court.

## IV. THE DEBTOR

### A. **Background and Current Business Operations**.

Casale Marble Imports, Inc. ("Casale" or "Casale Marble") is a well known leader in the Florida marble and granite market. Casale owns and operates a marble fabrication and installation business located in Palm Beach County, Florida. Casale is owned one hundred (100%) percent by its founder D. Walter Casale ("Mr. Casale"). Both prior to the filing of these chapter 11 proceedings and during the pendency of this case, Mr. Casale holds the position of president and Sylvana Casale holds the position of the controller of Casale Marble.

Casale is one of the largest distributors, fabricators and installers of natural stone and marble products in Florida. Casale provides the highest quality natural stone flooring and slabs by utilizing its channels of wholesale distribution and fabrication/installation of flooring and countertop materials to builders, developers, architects, contractors, designers and individual home owners. Casale maintains an extensive inventory of granite, marble, onyx, travertine, limestone, quartzite and soapstone, creating a collection of over 250 different colors and purchases stone products directly from quarries and manufacturers located in countries around the world, including Italy, Brazil, Peru, India, Spain, Portugal, Egypt, China, Greece and Israel.

Casale provides fabrication and installation services to both the Custom Home and Production Home segments of the residential construction industry. Casale's account representatives work closely with each custom home client to accurately define the project's scope. Every aspect of material selection (i.e., color, finish, quality) and maintenance are discussed in detail. With the Company's bar coded inventory system every item has a unique lot number that allows each client to select the actual material to be fabricated and installed on a project. Other than limitations related to slab size, there are no shapes or designs Casale's fabricators are unable to duplicate. Casale is able to manufacture unique pieces such as countertops, bar tops, islands, tub decks, stair cases, fireplaces and shower enclosures. The Company delivers materials on time and installs them professionally in accordance with design specifications and construction schedules.

With regard to Production Homes, Individual and Multi-Family Production (Tract) Homes supported Casale Marble in its infancy. The Company's production installation program has been perfected over the years and all begins in the design center. Casale supplies each design center with material displays that are carefully designed and meticulously maintained, allowing the buyer to make accurate and informed selections. When requested, account representatives are available to conduct personalized material selections at Casale's facility. Every production unit receives the same attention to detail and quality workmanship as the Company's Custom Home projects. Typically, the production and installation process, including template to final installation, is 12 to 14 business days, depending on backlog. Casale's management expertise on these projects ensures a timely and problem-free installation.

The commercial division of Casale Marble provides turnkey solutions for all commercial applications, including Class A buildings and high-rise and mid-rise buildings. Casale's resume of commercial projects includes office buildings, restaurants, casinos and commercial banks. Casale's Commercial Division clients receive the same quality materials, expert workmanship and professional project management as its Residential clients. Each project is continuously monitored by on-site managers and field superintendents to ensure that each project is professionally installed efficiently and on time. Casale's resume of projects includes office buildings, restaurants, casinos and commercial banks.

Mr. Casale began working for a family-owned natural stone installation company in South Florida in 1978. Mr. Casale was the Registered Agent for CB Marble which was a company that was owned and formed by two relatives of Mr. Casale. The Company was based out of Virginia and in 2002, Mr. Casale purchased it from his relatives. The Company failed and

became inactive and dissolved in 2003. Mr. Casale was the Secretary and his father Rocco Casale was the President of European Marble Imports, Inc. The Company began in 1985 after Mr. Casale graduated high school. The company became inactive and dissolved in 1988 when Mr. Casale's father became ill.

By the end of 1987, Mr. Casale expanded to 24 full-time crews and had a reputation as a premier natural stone installer. He started Casale Marble in 1994 with an initial cash investment of $1 million dollars which was utilized to purchase machinery, tooling, inventory and vehicles for fabrication and installation operations. In 1996, Casale Marble began importing materials for consumption in its fabrication/installation operation. By the end of 1999, inventory levels reached a point that allowed Casale to distribute natural stone products to other companies on a limited basis. In 2004, Casale's buying power with suppliers continued to grow stronger due to increasing volume of material purchased overseas.

Casale Marble Installation, Inc. was opened the same day as Casale Marble Imports. in 1994, with the thought of running labor only thru that company. However, upon advice of his professionals, Mr. Casale never used Casale Marble Installation, Inc. and only operated out of Casale Marble Imports. Casale Marble Installation, Inc. became inactive and was dissolved within six months of its formation.

Casale Marble expanded into the natural stone distribution business with the opening of CMI Stone Direct ("CMI"), a wholly owned subsidiary of Casale Marble. CMI Stone Direct, Inc currently operates as Casale Marble Imports, Inc (d/b/a CMI Stone Direct). It is Casale Marble's distribution department. Mr. Casale began CMI in 2005 in hopes to separate the Distribution Division from the Installation / Fabrication Division. All revenue and expenses run through Casale Marble Imports financials. In 2006, CMI opened a state- of- the- art facility in Ft. Myers to serve the West Coast of Florida. CMI Stone Direct, currently maintains 576,221 square feet of flooring tile and over 7,455 granite, marble, onyx and limestone slabs in over 250 colors. This is superior to Casale's competitors that typically maintain approximately 5,000 slabs and only 100-120 colors. CMI's customers include installers, builders, developers, architects and other construction professionals, in addition to residential homeowners. Distribution orders are typically $1,500 - $2,500, with larger orders of up to $50,000 in materials. Due to its large in-stock selection, CMI is able to secure larger jobs and attract builders and developers with last-minute projects and deadlines.

Based on Casale Marble's current year sales – Fabrication and Installation makes up about 51% of all sales while Distribution makes up about 49%.

Casale operates out of three (3) facilities. The first facility is located at 750 S.W. 17th Avenue, Delray Beach, Florida 33444. It is a 5,000 square-foot building with 30,000 square feet of outside storage space. The building contains Casale Marble's Installation Showroom; the Installation/Fabrication Sales Department and the Fabrication Shops main manufacturing area (which include saws, edge machines and water-jet machines). The outside storage area has the remaining stations of the fabrication shop under tents (these stations include edging detail,

14

lamination, polishing and holding areas for next day installations). There is also a trailer which has CMI Stone Directs Sales Office. Connected to this trailer is the Fabrication Department Office. The majority of the outside storage area has slab inventory where customers walk the yard to pick out their slab selection for installation of their orders. The Debtor occupies this property pursuant to a lease with Robert Case. The term of the Lease began in 1994 and renews every five (5) years. The current lease expired on March 31, 2010. Casale holds the right and intends to renew for an additional five (5) year term.

Across the street from this location is Casale Marble's second facility with an address of 751 S.W. 17th Avenue, Delray Beach, Florida, 33444. It is a 32,000 square foot building with an additional 30,000 of outside storage. The building houses most of the Flooring Inventory, the Flooring Installation Department, the Tops and Flooring Scheduling Department, the Tooling and Manufacturing Supplies area; the Accounting Department and the In-House Mechanic and Tool Repair Shop. The outside storage area holds additional slab inventory. The Delray Beach location currently has 60 employees and 8 crews of subcontractors. The Debtor occupies this property pursuant to a lease with Commercial Real Estate Investment Group. The property is owned by D. Walter Casale. The ten (10) year lease began in April, 2006 and expires on March 31, 2016. At expiration of this Lease, Casale Marble is granted two (2) five (5) year renewal options. The monthly lease payment covers the exact mortgage amount due and expenses on the property.

The third facility is located at 3531 Metro Parkway, Fort Myers, Florida 33916. This location is CMI Stone Direct's Fort Myers showroom/office/warehouse. It has a 27,000 square-foot building and 10,000 square feet of outside storage. The facility currently holds approximately $1.5 Million in Inventory and employs four (4) individuals. CMI leases the property from Metro & Sivan, a company owned by D. Walter Casale. The three (3) year lease began in September, 2006, and expired on September 30, 2009. However, two (2) three (3) year renewal options were granted. The current lease expires on September 30, 2012. The monthly lease payment covers the exact mortgage amount due on the property.

By expanding inventory, increasing market share and diversifying into the natural stone distribution business, Casale's revenue grew from $1.4 million in 1994 to nearly $26.0 million by 2007, representing annual growth at an annual growth rate of 23%.

## B.    **Events Leading to Chapter 11 Filing**

During the downturn in the South Florida housing market, Casale's sales declined from approximately $26.0 million in 2007 to $13.6 million in 2008. Due to (i) challenging macroeconomic and housing market conditions over the past two years, (ii) poor job costing and financial monitoring by Casale's former CEO, (iii) increased debt burdens associated with financing Casale's growth and (iv) inability to service a default interest rate of 18% on more than $8 million of debt, Casale Marble filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 14, 2008.

Despite such decreases in revenue, Casale's fixed costs remained largely the same, thereby adversely affecting Casale's cash flow and net income. This lack of cash flow has caused Casale to fall behind on its payment of sales and use taxes, and rent for its locations. Casale used its best efforts to seek and attempt to procure a strategic partner willing to infuse additional capital into the business, allowing Casale to sustain day-to-day operations while improving its inventory availability and increasing its advertising budget. As of the Petition Date, Casale was unable to secure any such equity capital.

## C. The Chapter 11 Case.

### 1. Commencement of the Chapter 11 Case.

On July 14, 2008 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Since that time, the Debtor operated as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. This Chapter 11 Case is pending before the Honorable Paul L. Hyman, Chief Judge for the United States Bankruptcy Court for the Southern District of Florida, located in West Palm Beach, Florida.

### 2. Appointment of Official Committee of Unsecured Creditors.

On August 1, 2008 (D.E. 50), the Office of the United States Trustee appointed an official committee of unsecured creditors in this Chapter 11 case (the "Committee"). The Committee has been represented by Tabas, Freedman, Soloff & Miller, P.A. ("TFSM").

### 3. First-Day Orders.

On July 14, 2008, in connection with its voluntary petition, the Debtor filed six (6) first day motions seeking approval from the Bankruptcy Court of what are known as "first-day orders". The first day orders were sought in order to facilitate the transition between the Debtor's pre-petition and post-petition business operations by authorizing the Debtor to continue certain regular business practices that may not be specifically authorized under the Bankruptcy Code, or for which the Bankruptcy Code requires prior court approval. Among the first day motions, the Debtor filed applications to retain its bankruptcy counsel, Paul L. Orshan, P.A. ("Orshan"). On July 16, 2008, the Bankruptcy Court entered an order approving the employment of Orshan.

As one of its first-day motions, the Debtor filed its *Emergency Motion for an Order (A) Authorizing the Debtor to (1) Use Cash Collateral on an Interim Basis Pursuant to 11 U.S.C. §363, and (2) to Provide Adequate Protection in Connection Therewith Pursuant to 11 U.S.C. §361, and (B) Setting a Final Hearing Pursuant to Bankruptcy Rule 4001* (D.E. 7) (the "Cash Collateral Motion"). RBC was the only entity who asserted a lien on the Debtor's cash collateral. In order to resolve RBC's claim to certain of the Debtor's cash collateral, RBC and the Debtor entered into an agreement regarding the use of cash collateral and nine (9) additional orders have been entered allowing the Debtor the continued use of cash collateral, with the agreement of RBC, through entry

16

of an order confirming the Debtor's plan of reorganization, or through May 31, 2010, whichever is sooner (and which may be extended as provided herein) consistent with the budget (the "Budget").

The Debtor also filed, and the Bankruptcy Court approved, the following additional first-day motions: (i) motion to pay the Debtor's pre-petition payroll and authorizing the maintenance of employee benefit programs, (ii) motion to authorize the continued use and maintenance of pre-petition bank accounts and cash management system, (iii) motion to prohibit utilities from discontinuing services post-petition and (iv) motion to establish procedures for filing fee applications.

### 4.    Debtor's Operations.

The Debtor has continued to comply with the Cash Collateral Orders and has provided RBC with its ongoing current financial information as required by the various Cash Collateral Orders. Throughout this case, the Debtor has continued to make regular periodic payments to RBC and has made post-petition payments to RBC in the amount of $3,665726.07 as of June 29, 2010.  In addition, the Debtor has continued to timely file its Monthly Debtor-In-Possession Reports.

Casale Marble has continued to cut its expenses. Indeed, Casale Marble plans to reduce its future operating costs in addition to the reductions that have already occurred. Casale Marble has reduced costs and expenses in every facet of the business which has allowed it to remain a positive cash flow post-petition even in an environment with the low volume of sales throughout the past 16 months since the Petition Date.

Prior to the Petition Date, Casale Marble had 132 employees with an average weekly gross pay of $99,000.  Casale Marble currently employs 60 employees and has an average weekly gross pay of $45,000.  The "Plan" actually calls for the hiring of additional outside sales personnel which will in turn generate an increase in sales. The present staff is working at their full capabilities and to contemplate reducing the work force even more than the present number would only disrupt the controlled operational system currently in place.  Contract labor is cyclical with sales volume.  If sales for flooring and countertop installation increase then contract labor costs increase.  Many of Casale Marble's current subcontractors have been with Casale Marble for longer than five (5) years. They are very experienced craftsmen, and are well aware of the quality and workmanship the customers expect from Casale Marble.  To replace the current crews with cheaper subcontractors would jeopardize Casale Marble's quality of work and in the long run actually not prove cost effective with increased damages, repairs, remakes and lost future sales.

The Debtor retained Bayshore Partners, LLC ("Bayshore") to assist the Debtor in obtaining new financing or to find a joint venture partner and/or purchaser. Despite its best efforts, Bayshore was unable to find an appropriate party to finance, purchase or joint venture. Bayshore was paid for its services and it not owed any payment from the Debtor.

In April of 2010, Casale Marble renewed its Health Insurance Benefit package and had an increase of 6.5%.   Although Casale Marble plans to revisit the health options and pricing

structure during its next renewal process in April of 2011, an additional 3.5% increase is anticipated. In January of 2009, Casale Marble's General Insurance & Worker's Compensation of over 15 years advised Casale Marble that because it was operating under Chapter 11, it would be very difficult to secure underwriters to agree to insure Casale Marble. As a result, Casale Marble's Worker's Compensation rate jumped to an annual rate of $140,000 (because of a Consent to Rate Change). Casale hired a new Insurance Agent who was able to reduce the annual rate to $78,000 without jeopardizing any coverage. The new agent was also able to reduce the Debtor's General Liability Insurance Rates.

After the filing of the Petition, Casale Marble returned many fleet vehicles that were not being utilized by Casale Marble to Enterprise Leasing. These returns reduced the Company's monthly vehicle use and related insurance expenses.

Casale Marble's sales for 2009 were $7.6 million, the lowest figure in over 12 years. Operating in Chapter 11 has been very difficult and trying for fabrication and installation sales. Although Casale Marble has an impeccable reputation and is known throughout the construction industry as a reliable and honest company, builders, designers, architects, contractors and homeowners have been very reluctant to place deposits or contracts in the hands of a "bankrupt" company. In addition, while operating under Chapter 11, Casale Marble lost its bonding capabilities. Without bonding, Casale Marble cannot operate on larger projects such as Class A buildings, commercial and high rise projects. Upon emerging from Bankruptcy, Casale Marble's long time clientele should return since the anxiety and worry of placing a deposit on a job will no longer exist. In addition, Casale Marble will be able to get bonded and in turn will contract with contractors and builders on much larger projects. With that, sales will increase and Casale Marble will regain its recognition as a leader in the South Florida area for its professionalism, quality, service and its competitive pricing.

The Debtor filed several motions seeking the extension of exclusivity and acceptance of the plan. Notwithstanding most extensions being granted by agreed order, RBC objected to the last extension and the Debtor agreed to file its Plan and Disclosure Statement no later than October 16, 2009. The Debtor filed its Plan of Reorganization (C.P. # 245) and accompanying Disclosure Statement (C.P. #246). The Debtor received two (2) objections to the Disclosure Statement. One filed by the Unsecured Creditor's Committee and the other from the Office of the United States Trustee. The Debtor then sought an extension of the Disclosure Statement hearing in an attempt to modify the Disclosure Statement to incorporate certain suggestions made in the two objections filed.

Notwithstanding RBC objection to continued exclusivity, the Debtor has continued a meaningful dialogue with RBC with the intention of reaching the terms for a consensual plan.

## V.    VOTING PROCEDURES AND REQUIREMENTS OF CONFIRMATION.

### A.    Creditors and Interest Holders Entitled to Vote.

Except as provided below, any holder of a Claim whose Claim is impaired under the Plan is entitled to vote if either (i) its Claim has been scheduled by the Debtor and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) such holder of a Claim has filed a proof of claim or interest on or before November 18, 2008, the deadline for filing a proof of claim. A holder of a disputed, unliquidated or contingent Claim, or the holder of a Claim that has been objected to, is not entitled to vote on the Plan unless such Claim has been allowed prior to the balloting deadline by the Bankruptcy Court after notice and a hearing, or the Bankruptcy Court estimates such Claim for voting purposes prior to the balloting deadline. In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by a creditor was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The holders of Claims in Class 1 are unimpaired and therefore deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

### B.    Definition of Impairment.

Under Section 1124 of the Bankruptcy Code, a class of Claims or Interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan:

(1)    leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(2)    not withstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default:

   (A)    cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code or of a kind that Section 365(b)(2) expressly does not require to be cured;

   (B)    reinstates the maturity of such claim or interest as such maturity existed before such default;

   (C)    compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

   (D)    if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor

19

or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(E)     does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

## C.     Votes Required for Class Acceptance.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan of reorganization or liquidation by a class of claims as the acceptance by holders of at least two-thirds in amount and more than one-half in number of the allowed claims of the class actually voting to accept or reject the proposed plan.    Section 1126(d) of the Bankruptcy Code defines acceptance of a plan of reorganization or liquidation by a class of interest holders as the acceptance by holders of at least two-thirds (2/3) in amount of the allowed interests of the class actually voting to accept or reject the proposed plan.

## D.     Information on Voting Ballots.

Ballots are being forwarded to the holders of Claims in all Classes under this Plan with the exception of Class 1.  Class 1 is unimpaired and therefore is deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

## VI.  CONFIRMATION OF THE PLAN

The Bankruptcy Code establishes certain procedural and substantive requirements for confirmation of a plan of reorganization or liquidation. In addition, the Bankruptcy Code provides a mechanism which enables the proponents of a plan of reorganization or liquidation to confirm such a plan, notwithstanding rejection thereof by a class of creditors or interest holders.

## A.     Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan, which hearing may be adjourned by order of the Bankruptcy Court (the "Confirmation Hearing"). The Bankruptcy Court has set the Confirmation Hearing before the Honorable Paul G. Hyman, Chief Judge, U.S. Bankruptcy Court, Southern District of Florida, 1515 North Flagler Drive, 8th Floor, Courtroom A, West Palm Beach, Florida 33401 U.S.A., on the date and time established in the Court's Order Approving Disclosure Statement. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. Any objection to confirmation must be made in writing and filed with the Bankruptcy Court with proof of service and served upon the following persons on or before the date established in the Court's Order Approving Disclosure Statement:

| Paul L. Orshan, Esq. | Heidi A. Feinman, Esq. |
|---|---|
| Paul L. Orshan, P.A. | U. S. Trustee's Office |
| 2506 Ponce de Leon Boulevard | 51 S.W. 1st Avenue, #1204 |
| Coral Gables, FL 33134 | Miami, Florida 33130 |
| paul@orshanpa.com | Heidi.A.Feinman@usdoj.gov |

Unless an objection to confirmation is timely filed and served, it may not be considered by the Bankruptcy Court.

## B.    Requirements for Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the substantive requirements for confirmation of a plan of reorganization or liquidation. At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan. The relevant requirements of Section 1129 of the Bankruptcy Code include:

(1)    The plan complies with the applicable provisions of the Bankruptcy Code.

(2)    The proponent of the plan has complied with the applicable provisions of the Bankruptcy Code.

(3)    The plan has been proposed in good faith and not by any means forbidden by law.

(4)    Any payment made or promised by a debtor or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with the case, or in connection with the plan and incident to the case, has been disclosed to the court, and any such payment made before the confirmation of the plan is reasonable, or if such payment is to be fixed after confirmation of the plan, such payment is subject to the approval of the court as reasonable.

(5)    The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of a debtor, an affiliate of a debtor participating in a joint plan with a debtor, or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy, and the proponent of the plan has disclosed the identity of any insider that will be employed or retained by a reorganized debtor and has disclosed the nature of any compensation for such insider.

(6)    Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(7)     With respect to each class of impaired claims or interests --

    (A)     either each holder of a claim or interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor was liquidated on such date under chapter 7 of the Bankruptcy Code; or

    (B)     if Section 1111(b)(2) of the Bankruptcy Code applies to the claim of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claim.

(8)     Each class of claims or interests has either accepted the plan or is not impaired under the plan, or the requirements of Section 1129(b) are satisfied.

(9)     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim:

    (A)     The plan provides that administration expenses and gap period claims will be paid in full on the effective date;

    (B)     Priority claims (other than gap period claims and tax claims) will receive, if such class has accepted the plan, deferred cash payments of a value equal to the allowed amount of such claim or, if such class has rejected the plan, payment in full on the effective date of the plan;

    (C)     The plan provides that allowed unsecured claims of governmental units for certain kinds of taxes will receive on account of such claim regular installment payments in cash:

        (i)     of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

        (ii)     over a period ending not later than 5 years after the date of the order for relief under section 301, 302 or 303 of the Bankruptcy Code; and

        (iii)     in a manner not less favorable than the most favored non-priority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b); and

    (D)     The plan provides that holders of secured claims which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, will receive on account of

22

that claim, cash payments, in the same manner and over the same period, as prescribed in 11 U.S.C. § 1129(a)(9)(C).

(10)    If a class of claims is impaired under the plan, at least one class of impaired claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim of such class.

(11)    Confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

(12)    All fees payable under Section 1930 of title 28, United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

(13)    The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is described in 11 U.S.C. §1114, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

(14)    All transfers of property of a plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

The Debtor believes that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code, and that the Debtor has complied, or will have complied, with all of the requirements of chapter 11, including Section 1129.

## C.    **Cramdown.**

The Bankruptcy Code provides for confirmation of a plan even if it is not accepted by all impaired classes of claims if at least one impaired class has voted to accept the plan and certain other conditions are satisfied. These so-called "cramdown" provisions for confirmation are set forth in Section 1129(b) of the Bankruptcy Code. If any impaired class of claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired class which has not accepted the Plan, the Plan does not "discriminate unfairly" and is "fair and equitable." The phrase "fair and equitable" has different meanings for secured and unsecured claims and classes of interests. Because one or more Classes of Impaired Claims under the Plan will be deemed to have rejected the Plan, the Debtor reserves the right to request the Bankruptcy Court to determine at Confirmation whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting Impaired Class of Claims or Interests so as to allow Confirmation despite the

vote to reject the Plan. The Debtor also reserves the right to amend the Plan at that time and in such a manner as to permit Confirmation over the vote of the rejecting Impaired Class.

## VII. SUMMARY OF THE PLAN

### A.    Introduction.

Set forth below is a summary of the Plan, which is qualified in its entirety by reference to the complete text of the Plan. ALL CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO READ AND REVIEW THE TEXT OF THE PLAN ITSELF PRIOR TO VOTING ON WHETHER TO ACCEPT OR REJECT THE PLAN.

This summary is intended merely to provide a perspective on the means for execution and implementation of the Plan and the treatment provided to the various Classes of Claims and Interests.

### B.    Classifications of Claims and Interests.

The Claims of all creditors against, and the Interests of all shareholders in, the Debtor under the Plan are classified as follows:

|     |          |                            |
|-----|----------|----------------------------|
| a.  | Class 1: | Allowed Priority Claims.   |
| b.  | Class 2: | Allowed RBC Secured Claim. |
| c.  | Class 3: | Allowed Unsecured Claims.  |
| e.  | Class 4: | Allowed Interests.         |

Classes 2, 3 and 4 are impaired under the Plan. Class 1 is not impaired under the Plan. As such, Class 1 is deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

### C.    Treatment of Unclassified Claims.

In addition, the Plan provides for the treatment of unclassified Claims for Allowed Administrative Claims, Allowed Priority Tax Claims and fees due the Office of the United States Trustee. Specifically, the Plan provides that the unclassified Claims shall be treated as follows:

**Administrative Claims**. The holders of Allowed Administrative Claims against the Estate (with the exception of the professionals (the "Professionals") employed pursuant to Sections 327, 503(b)(3) and (4) and 1102 of the Code, who will be paid 100% of the amount allowed of such Administrative Claims by the Bankruptcy Court, upon application to the Bankruptcy Court, prior to the bar date for filing such applications and entry of an order(s) thereon) shall be paid 100% of their Allowed Administrative Claims in Cash, unless otherwise ordered by the Bankruptcy Court, upon the earlier to occur of (i) the later of the Effective Date or the date of a Final Order allowing such Administrative Claim; (ii) upon such other dates and terms as may be agreed upon by the holder of

any such Allowed Administrative Claim and the Debtor or Reorganized Debtor. Each Ordinary Course Administrative Claim shall be paid in full in Cash at the Reorganized Debtors' election either: (a) in accordance with the terms and conditions under which the Claim arose; or (b) on such date on which the holder of the Claim and the Reorganized Debtors agree. Payments shall be made without further action by the holder of the Ordinary Course Administrative Claim.

At present, the Debtor does not anticipate incurring any material non-professional Administrative Claims through confirmation of the Plan other than as set forth on the Reorganized Debtor's Projections attached hereto as Exhibit B. To the best of the Debtor's knowledge, all non-professional Administrative Claims, to the extent incurred, have been paid in a timely manner and shall continue to be paid from Cash in the Estate. The Debtor estimates that the Effective Date will occur on or aboutAugust, 2010.

With respect to Administrative Claims for professional fees and expenses, there are presently two (2) professionals involved in this case whose employment has been approved by the Bankruptcy Court, namely; (i) Paul L. Orshan, P.A., general bankruptcy counsel to the Debtor; and (ii) Tabas, Freedman, Soloff & Miller, P.A. ("TFSM"), counsel to the Committee.

The Debtor paid a pre-petition retainer to Orshan in an aggregate amount equal to $71,493.75, a portion of which equal to $1,493.75 was used to pay the fees and expenses incurred in the filing of the within Chapter 11 Case and a portion of which equal to $70,000.00 constituted a retainer for this Chapter 11 Case.

Orshan has incurred fees and expenses from the Petition Date through May 30, 2010, in the approximate amount of **$111,279.93,** which fees and expenses are subject to the final approval of the Bankruptcy Court. The Debtor estimates that Orshan will incur approximately $25,000.00in additional fees and expenses from April 1, 2010 through the Effective Date.

TFSM has incurred fees and expenses from the August 1, 2008, through May 30, 2010, in the amount of **$88,665.65,** which fees and expenses are subject to the final approval of the Bankruptcy Court. The Debtor estimates that TFSM will incur approximately $5,000.00 in additional fees and expenses from through the Effective Date.

**Priority Tax Claims.**    Each holder of an Allowed Priority Tax Claim under Section 507(a)(8) of the Code shall be paid in full in Cash on the later of (a) the Effective Date (or as soon after that date as practicable) and (b) 30 days after the Claim is Allowed, provided however, that the Debtor or the Reorganized Debtor may elect to pay any Allowed Priority Tax Claim through regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of the Claim, over a period ending not later than five years after the Petition Date, and in a manner not less favorable than the most favored Unsecured Claim provided for by this Plan. If the Debtor or the Reorganized Debtor so elect, the installment payments shall be made in equal quarterly installments of principal plus simple interest on the unpaid portion of the Allowed Priority Tax Claim accruing from the Effective Date at the rate of six percent per year. The first payment shall be made on the latest of: (a) the Effective Date, or as soon after that date as practicable; (b) 30 days after the Claim is Allowed, or as soon after that date as practicable; and (c) another date on which the

holder of the Claim and the Debtor or the Reorganized Debtor agree. The Reorganized Debtor retains the right to prepay any Allowed Priority Tax Claim, or any remaining balance of such a Claim, in full or in part, at any time on or after the Effective Date without premium or penalty. Based upon the Schedules and the proofs of claims filed to date in this Chapter 11 Case, the Debtor estimates approximately $24,819 in Priority Tax Claims against the Estate.

**United States Trustee's Fee**.  The Debtor shall pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) on the Effective Date, and simultaneously provide to the U.S. Trustee an appropriate affidavit indicating Cash disbursements for all relevant periods; notwithstanding anything contained in the Plan to the contrary, the Disbursing Agent shall further pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) for post-confirmation periods within the time periods set forth in 28 U.S.C. §1930(a)(6) until the earlier of the closing of this case by the issuance of a Final Decree by the Bankruptcy Court, or upon entry of an order of this Bankruptcy Court dismissing the case, or converting this case to another chapter under the United States Bankruptcy Code, and the Disbursing Agent shall provide to the U.S. Trustee, upon the payment of each post-confirmation payment, a quarterly report and appropriate affidavit indicating income and disbursements for the relevant periods. To date, the Debtor has paid all fees due and owing to the Office of the United States Trustee, and the Debtor or Reorganized Debtor, as applicable, anticipates paying all such fees through confirmation of the Plan and thereafter as provided herein.

**D.    Treatment of Classified Claims.**

Classes 2, 3 and 4 are impaired under the Plan. Class 1 is not impaired under the Plan. The Classes of Claims and Interests under the Plan shall be treated as follows:

1.    Class 1. Allowed Priority Claims. All Allowed Priority Claims shall be paid in full, in Cash, on the later of: (i) the Effective Date; or (ii) within 30 days after the date of a Final Order allowing such Priority Claim.

2.    Class 2. Allowed Secured Claim of RBC Bank. RBC has a valid first priority lien on all assets of the Debtor. During the pendency of this Chapter 11 case, RBC has received payments from the Debtor totaling $ 3,665,726.07 *as of June 29, 2010.*

The Allowed RBC Secured Claim of $5,067,564.54 (as of June 29, 2010) shall be satisfied in full by the payment of equal monthly installments of principal and interest over a period of 36 months after the Effective Date, which installments will be based upon a seven (7) year amortization and interest at a floating rate of 30-day LIBOR plus five percent (5%), with a balloon at maturity. Such monthly payments shall commence on the first day of the month immediately following the month in which the Effective Date occurs and shall continue thereafter for 35 months, provided the following:

a. Provided all monthly payments are made and the Out-of-Margin position on the Borrowing Base Certificate is reduced to $200,000.00 within the first twelve (12) months, and to $100,000.00 within the first eighteen (18) months, the loan will be extended for an additional six (6)

months, at the end of twelve (12) months and eighteen (18) months, respectively.

b. Provided all monthly payments are made during the next six-month period and the Out-Of-Margin position on the Borrowing Base Certificate is reduced to $0.00, the loan will be extended an additional twelve (12) months;

c. At the end of twenty-four (24) months, excess cash will be shared 50/50 between the Debtor and RBC.

d. During Year 3, the Borrowing Base Certificate will remain at $0 and the Debtor will pay RBC (in addition to the regular loan payment) $15,000.00 each month to be applied toward the principal balance.

e. On or before the Effective Date, the Debtor will move all operating accounts to RBC.

f. The unpaid balance of principal, accrued interest and other charges outstanding under the RBC Allowed Secured Claim will be paid in full on the last monthly payment date (the "Maturity Date").

g. RBC shall retain its Liens on the Reorganized Debtor Assets pursuant to and as set forth in the Loan Documents, provided however, that, on the Effective Date, the Reorganized Debtor shall execute and deliver the Restructured Loan Documents consistent with the terms of the Plan.

Also on the Effective Date, or as soon as practical thereafter, RBC, the Debtor and the Guarantors shall dismiss without prejudice the RBC Foreclosure Litigation including the Counterclaim. In addition, as of the Effective Date, RBC shall agree to cease prosecuting any and all claims under and pursuant to the Affiliate Guaranty, with all defaults there under being deemed cured as of the Effective Date and with such Affiliate Guaranty being reinstated and confirmed, included as a part of the Restructured Loan Documents.

3.      Class 3.  Allowed Unsecured Claims.  The holders of Allowed Unsecured Claims shall be satisfied in full by the payment of their pro rata share of $810,000.00 commencing on the first day of the thirty-seventh month following the month in which the Effective Date occurs and continuing on a monthly basis thereafter for a total of thirty-six (36) months. The monthly payments for months 37 to 48 will be $17,500.00. The monthly payments for months 49 to 72 will be $25,000.00. Pursuant to the Projections attached to the Disclosure Statement as Exhibit B, the Debtor estimates the total amount of Allowed Unsecured Claims to equal $2,304,715.87 based on the amount of Unsecured Claims listed in the Schedules. Although, it appears that the asserted amount of Allowed Claims is higher than the original claims of $2,276,291.50 reported on the Schedule F, the Debtor believes this is due to a timing issue. The Debtor was still receiving pre-petition invoices from unsecured creditors as late as four (4) months after the Company filed for Chapter 11 Bankruptcy. Notwithstanding such estimate, the ultimate amount of the Allowed Unsecured Claims may be greater or less than such amount as a result of Objections to Claims that may be filed by the Debtor. Therefore, the final dollar amount of the

total Allowed Unsecured Claims may increase or decrease, which will cause the percentage of distribution to increase or decrease accordingly.

Each holder of an Allowed Unsecured Claim shall receive an amount equal to such holder's Pro Rata Share of each such Distribution being made hereunder. All Distributions to holders of Allowed Unsecured Claims hereunder shall be made from Cash on deposit as of the Effective Date and Cash generated by the Reorganized Debtor's operations from and after the Effective Date.

    4.    Class 4. Allowed Interests. This class consists of the 100% interest in the Debtor owned and held by D. Walter Casale. Mr.Casale shall retain his equity interests in the Reorganized Debtor from and after the Effective Date. Mr.Casale shall not pay any amount to the Estate in exchange for his retention of his equity interests.

## E.    Implementation of the Plan

    1.    **Transfer and Vesting of Property of the Estate**.

On the Effective Date of the Plan, all Reorganized Debtor Assets, including Cash and Litigation Claims, shall be transferred to, be deemed transferred to, and vested in the Reorganized Debtor, free and clear of all liens, claims, encumbrances and interests existing before the Effective Date except as provided under the Plan or the Confirmation Order. From and after the Effective Date, the Reorganized Debtor may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, including the employment of, and payment to, Professionals except as otherwise provided in this Plan or the Confirmation Order.

From and after the Effective Date, the Debtor will continue to exist as a separate corporate entity, with all the powers of a corporation under applicable law in the State of Florida pursuant to its articles of incorporation and bylaws or other organizational documents in effect prior to the Effective Date. As of the Effective Date: (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements related to or contemplated by this Plan; and (b) the other matters provided for under, or in furtherance of, this Plan involving corporate action required of the Debtor, will be deemed to have occurred and become effective as provided in this Plan, and will be deemed authorized and approved in all respects without further order of the Bankruptcy Court or any further action by the stockholders or directors of the Debtor. The Reorganized Debtor will assume any pre-Petition Date indemnification obligations to any current or former directors and officers employed by the Debtor as of the Effective Date.

To the extent applicable, the Reorganized Debtor shall be deemed a representative of the Estate appointed for all purposes as provided in and pursuant to Section 1123(b)(3) of the Bankruptcy Code, including to pursue applicable Litigation Claims.

On the Effective Date, the Disbursing Agent shall be authorized to pay from Cash all Allowed Administrative Claims, all Allowed Priority Claims, all Allowed Priority Tax Claims and the fees of the Office of the United States Trustee all in accordance with the terms of the Plan.

28

Finally, from and after the Effective Date, the Reorganized Debtor shall be authorized to make the required Distributions to the holders of Allowed Secured Claims and Allowed Unsecured Claims in accordance with the Plan.

The Disbursing Agent may require any party entitled to a Distribution under the Plan to furnish to the Disbursing Agent its, his or her employer or taxpayer identification number (the "TIN") assigned by the Internal Revenue Service. The Disbursing Agent may condition any Distribution under the Plan on the receipt of such TIN. If any party entitled to a Distribution hereunder fails to provide the Disbursing Agent with a requested TIN within forty-five (45) days after the request thereof by the Disbursing Agent, then such failure shall be deemed to be a waiver of such party's interest in the Reorganized Debtor and any future Distributions, including the right to receive any future Distributions.

### 2.  Management

After the Effective Date, it is contemplated that the Reorganized Debtor shall continue to be managed by D. Walter Casale as its president and by Sylvana Casale as its controller. As of the Effective Date, Mr. Casale's annual salary from the Reorganized Debtor shall be in the amount of $100,000, and Sylvana Casale's annual salary from the Reorganized Debtor shall be in an amount equal to $75,000. From and after the Effective Date, Mr. Casale and Sylvana Casale shall also be entitled to any and all benefits that they received from the Debtor prior to the Effective Date.

### 3.  Delivery of Restructured Loan Documents to RBC

On the Effective Date, the Reorganized Debtor shall deliver the Restructured Loan Documents required by RBC in connection with the restructured terms of the Allowed RBC Secured Claim.

### 4.  Plan Funding

The Plan will be funded with Cash existing on the Effective Date and Cash generated by and from the Reorganized Debtor's operations from and after the Effective Date, as set forth in the Projections.

### 5.      Disputed Claims Fund.

On the Effective Date of the Plan, or as soon thereafter as possible, the Disbursing Agent shall establish a Disputed Claim Fund for the Reorganized Debtor. The Disbursing Agent shall be authorized to make the Distributions to the holders of Allowed Claims and Allowed Interests pursuant to the terms of the Plan, provided that the Disbursing Agent maintains the Disputed Claim Fund, if applicable, and sufficient funds to pay all Post-Confirmation Administrative Claims.

To the extent Disputed Claims in any Class exist as of the Effective Date, the Disbursing Agent shall reserve from any Distribution Cash in an amount equal to the *pro rata* portion of such Distribution to which such Disputed Claim would be entitled if allowed in the amount asserted by

the holder of such Disputed Claim. If a Disputed Claim is allowed, in part or in full, then the Disbursing Agent shall, from Cash theretofore deposited into the Disputed Claim Fund allocable to such Claim, distribute to the holder of any such Claim an amount equal to such Claimant's *pro rata* share, based on such Allowed Claim, of all Distributions previously made to holders of Allowed Claims in the Class of Claims at issue. The balance, if any, of the Cash reserved for such Disputed Claim, including in the event the Disputed Claim is disallowed in its entirety, shall be transferred to by the Disbursing Agent. Notwithstanding anything herein to the contrary, no interest shall accrue or be payable on the Cash deposited into the Disputed Claim Fund in respect of any Disputed Claims, except as provided under the Plan.

   6.   **Miscellaneous.**

   Except to the extent otherwise provided under the Plan or the Confirmation Order, upon the Effective Date, all pre-Petition Date agreements (other than assumed contracts and third party guaranties and indemnities of the Debtor's obligations), credit agreements, pre-Petition Date loan documents and post-Petition Date loan documents to which the Debtor is a party, and all lien claims and other evidence of liens against the Debtor, shall be deemed to be cancelled and of no further force and effect, without any further action on the part of the Debtor. The holders of, or parties to, such cancelled instruments, agreements, securities and other documentation will have no remaining rights arising from or relating to such documents or the cancellation thereof, except the rights provided pursuant to the Plan and the Confirmation Order and any rights that, by the terms of the applicable agreement, survive the termination of such agreement.

   Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Chapter 11 Case, when all Disputed Claims against the Debtor have become Allowed Claims or have been disallowed by Final Order, and all Distributions required by the terms of the Plan have been made in accordance with the Plan, or at such earlier time as the Reorganized Debtor deems appropriate, the Reorganized Debtor shall file a final accounting with the Bankruptcy Court, together with a final report, and shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

F.   **Preservation of Claims and Causes of Action.**

   The Reorganized Debtor will have authority to take all actions necessary to: (a) investigate, hold, manage, protect, administer, collect, sell, liquidate, prosecute, transfer, resolve, settle, adjust, invest, distribute, or otherwise dispose of any Reorganized Debtor Assets, including but not limited to the Litigation Claims; (b) investigate and reconcile Claims and contest objectionable Claims and Disputed Claims; (c) make all Distributions to be funded under the Plan; (d) pay all necessary expenses incurred in connection with the duties and responsibilities of the Reorganized Debtor under the Plan; (e) administer, implement and enforce all provisions of the Plan; (f) file tax returns and make other related corporate filings; (g) administer the Plan and the Reorganized Debtor Assets; (h) abandon any Reorganized Debtor Assets; (h) to purchase and carry all insurance policies and pay all premiums and costs deemed necessary and advisable; (i) take and any all actions not inconsistent

with applicable law or not expressly prohibited by this Plan; and (j) undertake such other responsibilities as are reasonable and appropriate in connection with the Plan.

To the extent that certain Litigation Claims are filed by the Debtor and are not resolved prior to the Effective Date, such Litigation Claims will be transferred to and vest in the Reorganized Debtor pursuant to the terms of the Plan. The Litigation Claims that will be transferred to and vest in the Reorganized Debtor pursuant to the terms of the Plan include specifically the following:

a.      Any and all claims and causes of action, including Litigation Claims, under state or federal law against any and all of the present and former officers, directors, shareholders, principals, employees, agents and affiliates of, and professionals employed by, the Debtor and of any affiliates of the Debtor,[1] in any way related to, including providing aid and assistance in connection with: (i) the operation, management, funding and fund raising of the Debtor, including without limitation, breach of fiduciary duty, negligence, negligent management, fraud, civil theft, civil RICO or conspiracy, conversion, alter ego, misrepresentation, professional malpractice, corporate advantage, theft of corporate opportunities, wasting of corporate assets, equitable subordination of claims, breach of contract and federal or state statutory claims (including securities laws violations), as well as aiding and abetting any of the above; (ii) the sale, transfer, exchange or disposition of any property of the Debtor or any of its affiliates, or any preferred stock, common stock or equity or similar interest or securities therein, either prior to or after the Petition Date; or (iii) the conversion, misappropriation or misapplication of property of the Debtor or its affiliates or any products or proceeds there from.

b.      Any and all claims and causes of action, including Litigation Claims, under state or federal law, including federal or state securities laws, against those persons or entities, who participated or had any involvement in, as transferor, transferee, recipient or otherwise, related to the sale, transfer, exchange or disposition of any property of the Debtor or any of its affiliates, any preferred stock, common stock, or equity or similar interests or securities in the Debtor or its affiliates or the products or proceeds thereof, including without limitation, under and pursuant to state preference and fraudulent conveyance laws and Sections 542 through 550 of the Bankruptcy Code.

c.      Any and all claims and causes of action involving or in any way related to the collection of accounts receivables, notes receivables, loans receivables or other receivables owed to the Debtor.

d.      Any and all claims and causes of action seeking to subordinate, equitably or otherwise Claims filed against the Estate, or to re-characterize such Claims as equity Interests in the Debtor.

---

[1] All such claims and causes of action shall include and encompass, without limitation, any and all claims under any policies of insurance maintained by the Debtor applicable to such claims and causes of action, including, without limitation, director and officer liability insurance policies.

31

e.    Notwithstanding the specificity of the claims and causes of action described in this Disclosure Statement, nothing in the Plan or herein will limit or restrict in any way the rights of the Disbursing Agent in connection with pursuing any and all Litigation Claims on behalf of the Reorganized Debtor pursuant to the terms of the Plan.

IN ADDITION TO THE ABOVE, THE DEBTOR MADE CERTAIN PAYMENTS TO PERSONS AND ENTITIES BOTH WITHIN NINETY (90) DAYS PRIOR TO THE PETITION DATE AND WITHIN ONE (1) YEAR PRIOR TO THE PETITION DATE. ATTACHED HERETO AS **EXHIBITS D AND E** ARE LISTS OF THE PAYMENTS MADE WITHIN NINETY (90) DAYS AND INSIDER PAYMENTS MADE WITHIN ONE (1) YEAR PRIOR TO THE PETITION DATE, RESPECTIVELY. **ALL SUCH PERSONS AND ENTITIES MAY BE SUBJECT TO CLAIMS AND CAUSES OF ACTION RELATED TO THE RECOVERY OF SUCH PAYMENTS, INCLUDING CLAIMS AND CAUSES OF ACTIONS UNDER AND PURSUANT TO SECTIONS 542 THROUGH 550 OF THE BANKRUPTCY CODE OR OTHERWISE, ALTHOUGH THE REORGANIZED DEBTOR DOES NOT INTEND TO PURSUE ANY SUCH CLAIM OR CAUSE OF ACTION AGAINST D. WALTER CASALE OR AGAINST ENTITIES THAT HAVE CONTINUED TO CONDUCT BUSINESS WITH THE DEBTOR POST-PETITION**

Lastly, there may be claims and causes of action which currently exist or may subsequently arise that are not set forth specifically herein because the facts upon which such claims and causes of action rest are not fully or currently known by the Debtor. The failure to list any such claims or causes of action is not intended to limit the rights of the Liquidating Agent to pursue such claims and causes of action at such time as the facts giving rise thereto become fully known.

Notwithstanding anything to the contrary in the Plan or in the Disclosure Statement, the provisions of the Disclosure Statement and the Plan that permit the Reorganized Debtor to enter into settlements and compromises of any Litigation Claims shall not have, and are not intended to have, any *res judicata* effect with respect to any Litigation Claims that are not otherwise treated under the Plan and shall not be deemed a bar to asserting such Litigation Claims, regardless of whether or to what extent such Litigation Claims are specifically described in the Plan or Disclosure Statement relating hereto. Unless any of the Litigation Claims are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or by Final Order of the Bankruptcy Court, all such Litigation Claims are expressly reserved and preserved for later adjudication and, therefore, no preclusion doctrine, including without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to the Litigation Claims upon or after confirmation or consummation of the Plan.

In the event that the Bankruptcy Court, or any other court of competent jurisdiction, determines that the assignment of any claim, right or cause of action, including without limitation, the Litigation Claims to the Reorganized Debtor pursuant to this Plan, is invalid, or does not grant to the Reorganized Debtor the standing and all other rights necessary to pursue such claim, right or cause of action, then in such case the Reorganized Debtor shall be deemed appointed as the representative of the Estate for purposes of enforcing and pursuing such claim, right or cause of

32

action, including without limitation, the Litigation Claims, and the proceeds thereof shall be distributed in accordance with term of the Plan.

Furthermore, notwithstanding any provision or interpretation to the contrary, nothing in the Plan or the Confirmation Order, including the entry thereof, shall be deemed to constitute a release, waiver, impediment, relinquishment or bar, in whole or in part, of or to any recovery rights or any other claim, right or cause of action possessed by the Debtor or the Debtor's Estate prior to the Effective Date.

ANY CREDITOR OR PARTY IN INTEREST VOTING ON THE PLAN SHOULD ASSUME IN CONNECTION WITH SUCH VOTE THAT LITIGATION CLAIMS EXIST AGAINST SUCH CREDITOR OR PARTY IN INTEREST AND THAT THE DEBTOR AND/OR REORGANIZED DEBTOR INTEND TO AND SHALL PURSUE SUCH LITIGATION CLAIMS.

## G.    Injunction and Other Limitations of Liability

### 1.    Applicability of Injunction/Stay as to Reorganized Debtor's Assets of Estate

*Unless otherwise provided herein, all injunctions or stays applicable to the property of the Estate pursuant to section 541 of the Bankruptcy Code (including property acquired after the Petition Date), whether pursuant to Section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect with respect to the Reorganized Debtor Assets. In addition, the Reorganized Debtor shall have the right to invoke the provisions of the Bankruptcy Code made applicable by the Plan to the Reorganized Debtor Assets and all of the Bankruptcy Rules until the entry of a final decree closing this Chapter 11 Case.*

*Except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons who have held, hold or may hold Claims, rights, causes of action, liabilities or any equity Interests with respect to the Debtor or its property based upon any act or omission, transaction or other activity of any kind or nature that occurred or arose prior to the Effective Date, regardless of the filing, lack of filing, allowance or disallowance of such a Claim or Interest and regardless of whether such Person has voted to accept the Plan and any successors, assigns or representatives of the foregoing, will be precluded and permanently enjoined on and after the Effective Date from, on account of such Claims, rights, causes of action, liabilities or any equity Interests, (a) commencing or continuing in any manner any action or other proceedings against the Reorganized Debtor or the Reorganized Debtor Assets, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Reorganized Debtor or any Reorganized Debtor Assets, (c) creating, perfecting or enforcing any encumbrance of any kind against the Reorganized Debtor or any Reorganized Debtor Assets, and (d) asserting any Claims that are released hereby or subject to discharge pursuant hereto.*

*Confirmation of this Plan shall act as an injunction against any Person commencing or continuing against the Reorganized Debtor or the Reorganized Debtor Assets, any action, employment of process, or act to collect, offset, or recover any Claim or cause of action such person may possess against the Debtor.*

33

2. **Discharge.**

*Except as provided in this Plan or the Confirmation Order, the rights granted under this Plan and the treatment of Claims and Interests under this Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims including any interest accrued on Unsecured Claims from the Petition Date. Except as provided in this Plan or the Confirmation Order, confirmation of this Plan discharges the Debtor and the Reorganized Debtor from all Claims or other debts that arose before the Confirmation Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h) or 502(i), whether or not: (i) a proof of claim based on such debt is filed or deemed filed under Bankruptcy Code § 501; (ii) a Claim based on such debt is Allowed under Bankruptcy Code § 502; or (iii) the holder of a Claim based on such debt has accepted this Plan. Without limiting the foregoing, the discharge granted under this Plan is granted to the fullest extent allowed under Bankruptcy Code §§ 1141(a), 1141(b), 1141(c), and 1141(d)(1).*

## H.    Alternatives to the Plan.

If the Plan is not confirmed, then one alternative would be the conversion of this Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, which would require the appointment of a Chapter 7 trustee to control the liquidation and distribution of all assets of the Debtor and the Debtor's Estate. The Debtor believes that the conversion of this case to a Chapter 7 would materially adversely affect the timing and amount of the Distributions that would ultimately be made to holders of Allowed Claims. Specifically, the Debtor believes that a Chapter 7 trustee, and any professionals engaged by the Chapter 7 trustee, will add additional and unnecessary administrative expense to the Estate, thereby reducing the amounts that could be distributed to holders of Allowed Claims. In connection therewith, the Debtor refers all creditors and parties in interest to the Liquidation Analysis attached hereto as **Exhibit C**. As set forth in such Liquidation Analysis, the Debtor asserts that there will be a higher distribution to holders of Allowed Claims under the Plan than in aChapter 7 liquidation.

The second alternative to the proposed Plan is the dismissal of this Chapter 11 Case. In that event, however, secured and unsecured creditors of the Debtor would quickly file suit or continue with their pre-petition suits against the Debtor in various courts. The court presiding over any particular court proceeding would not have jurisdiction over any other proceeding, and as a consequence each creditor would be free to undertake such collection activity, including lawsuits, as such creditor deemed appropriate, all in what would amount to a "race to the courthouse." These consequences are exactly the types of activities that the bankruptcy process is designed to avoid. It is only through the bankruptcy process that the Debtor's creditors can be treated in accordance with each creditor's respective rights.

A third alternative in the event the Plan is not confirmed is that the Debtor, a creditor or another party in interest could attempt to formulate and propose a different plan of reorganization or liquidation. Initially, in order for another party in interest to file an alternate plan, the Bankruptcy Court would have to terminate the Debtor's exclusive right to file a plan under Section 1121 of the

Bankruptcy Code. The Debtor does not believe that an alternate plan under Chapter 11 of the Bankruptcy Code can be formulated that will provide for greater distributions to creditors than provided for under the Plan. Further, the Debtor believes that resolution of the issues in this Chapter 11 Case must be accomplished as soon as reasonably possible in order to preserve value for creditors. Any alternate plan would likely take significant time to formulate and propose, would likely substantially increase the administrative expenses in the Estate as well as jeopardize any value that is being preserved for the benefit of creditors.

Collectively, these factors clearly evidence that the Debtor's proposed Plan is superior to a liquidation under Chapter 7 of the Bankruptcy Code, dismissal of the bankruptcy case or the filing of an alternate plan of reorganization or liquidation. The Debtor firmly believes that the Plan results in a fair balancing of all parties' rights, and again urges creditors to vote to accept the Plan.

## I.    Tax Analysis

### 1.    In General

THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR, BUT IS NOT A COMPLETE DISCUSSION OF ALL SUCH CONSEQUENCES. CERTAIN OF THE CONSEQUENCES DESCRIBED BELOW ARE SUBJECT TO SUBSTANTIAL UNCERTAINTY DUE TO THE UNSETTLED STATE OF THE TAX LAW GOVERNING BANKRUPTCY REORGANIZATIONS. NO RULINGS HAVE BEEN OR WILL BE REQUESTED FROM THE INTERNAL REVENUE SERVICE (the "IRS") WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. FURTHER, THE TAX CONSEQUENCES OF THE PLAN TO THE HOLDERS OF CLAIMS AND INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OR EACH HOLDER, AND MAY BE AFFECTED BY MATTERS NOT DISCUSSED BELOW, SUCH AS THE SPECIAL RULES APPLICABLE TO CERTAIN TYPES OF HOLDERS (INCLUDING PERSONS SUBJECT TO SPECIAL RULES, SUCH AS, FOR EXAMPLE, NONRESIDENT ALIENS, LIFE INSURANCE COMPANIES AND TAX-EXEMPT ORGANIZATIONS). IN ADDITION, THERE MAY BE STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE PLAN APPLICABLE TO PARTICULAR HOLDERS OF CLAIMS OR INTERESTS, NONE OF WHICH ARE DISCUSSED BELOW. THEREFORE, THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST, AND EACH HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTOR IS URGED TO CONSULT HIS, HER OR ITS TAX ADVISORS CONCERNING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUNCES.

### 2.    Tax Consequences To Holders Of Claims

A portion of the consideration received pursuant to the Plan in payment of a Claim may be allocated to unpaid interest, and the remainder of the consideration will be allocated to the principal

amount of the Claim. The tax consequences of the consideration allocable to the portion of a Claim related to interest differs from the tax consequences of the consideration allocable to the portion of a Claim related to principal.

### 3.    **Consideration Allocable To Interest**

Holders of Claims will recognize ordinary income to the extent that any consideration received pursuant to the Plan is allocable to interest, and such income has not already been included in such Claim holder's taxable income. The determination as to what portion of the consideration received will be allocated to interest is unclear, and may be affected by, among other things, rules in the Internal Revenue Code relating to original issue discount and accrued market discount. Holders of Claims should consult their own tax advisors as to the amount of any consideration received under the Plan that will be allocated to interest.

If amounts allocable to interest are less than amounts previously included in the Claim holder's taxable income, the difference will result in a loss. Any amount not allocable to interest will be allocated to the principal amount of the Claim paid and discharged pursuant to the Plan, and will be treated as discussed below.

### 4.    **Consideration Allocable to Principal**

Holders of Claims receiving cash generally will recognize gain or loss on the exchange equal to the difference between the holder's basis in the Claim and the amount of cash received that is not allocable to interest. The character of any recognized gain or loss will depend upon the status of the Creditor, the nature of the Claim in its hands and the holding period of such claim.

If a Creditor has treated a Claim as wholly or partially worthless and been allowed and received a tax benefit due to a bad debt deduction, the Claim holder will include the amount of cash received in income to the extent such cash exceeds the holder's remaining tax basis in the Claim.

Holders of Claims may be entitled to installment sales treatment or other deferral with respect to the distribution they receive subsequent to the Effective Date. Holders of Claims may already have claimed partial bad debt deductions with respect to their Claims. The IRS may take the position that holders of Allowed Claims cannot claim an otherwise allowable further loss in the year in which their Claim is allowed because such claimants could receive further distributions. Thus, a holder of a Claim could be prevented from recognizing a loss until the time when its Claim has been liquidated and distributions have been completed. If a holder of a Claim is permitted to recognize a loss in the year of the Effective Date by treating the transaction as a "closed transaction" at such time, such holder may recognize income on any subsequent distribution.

### 5.    **Importance of Obtaining Independent Professional Tax Assistance.**

THE FOREGOING IS INTENDED AS A SUMMARY ONLY, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE

PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR AN ALLOWED INTEREST. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM AND ALLOWED INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL INCOME TAX AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

## J.    **Liquidation Analysis**

As a condition to confirmation of the Plan, the Debtor must demonstrate that each creditor holding an impaired Claim will receive at least what it would receive in a Chapter 7 case. This condition is known as the "best interests of creditors test." Typically, a Chapter 11 disclosure statement provides for a comparison of the projections of the future performance of the reorganized debtor versus what creditors could receive if they rejected the plan and the debtor's assets were liquidated. In this case, the Debtor has filed a Plan which proposes to reorganize all of the Debtor's Estate for the benefit of the creditors. The Debtor believes that the Plan will provide a greater distribution than would be achieved if the case were converted to a Chapter 7. A liquidation analysis for the Estate is attached hereto as Exhibit C.

## K.    **Risk Factors**

### 1.    **Introduction**

This section summarizes some of the risks associated with the Plan and the Debtor's ability to comply with the terms of the Plan. However, this analysis is not exhaustive and must be supplemented by an evaluation of the Plan and this Disclosure Statement as a whole by each holder of a Claim or Interest with such holder's own advisors.

AS SUCH, HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN, ITS IMPLEMENTATION OR ITS SUCCESS.

The risk factors present in a typical plan of reorganization are present in this Plan because this Plan provides for the re-vesting of all of the Debtor's assets in the Reorganized Debtor and the continuation of the Debtor's business through the Reorganized Debtor. In a typical plan of reorganization, the risks involved in the continued operation and success of a business are usually important to creditors in that proposed distributions to creditors often hinge on the ability of the business to generate sufficient revenue and profit.

There are many risk factors associated with the Plan. In no particular order, the risks include:

A.    The Reorganized Debtor may not achieve the projections attached to this Disclosure Statement, which could result in a default under the Plan.

B.    The credit markets and general economy may continue to deteriorate, or simply not improve, which will impact the Reorganized Debtor's ability to sell its assets or refinance the Allowed RBC Secured Claim at maturity, refinance or joint venture the Property.

C.    Other than the four (4) year term of the Plan, there are no set obligations to complete any particular task by a time certain.

### 2.    Bankruptcy Risks

#### (a)    *Risks Relating to Confirmation*

For the Plan to be confirmed, each impaired Class of creditors and holders of Interests is given the opportunity to vote to accept or reject the Plan, except for those Classes which will not receive any distribution under the Plan and which are, therefore, presumed to have rejected the Plan. There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.

If one or more of the impaired Classes vote to reject the Plan, then the Debtor may request that the Bankruptcy Court confirm the Plan by application of the "cramdown" procedures available under Section 1129(b) of the Bankruptcy Code. There can be no assurance, however, that the Debtor will be able to use the cramdown provisions of the Bankruptcy Code to achieve Confirmation of the Plan.

If the Plan were not to be confirmed, it is unclear what Distribution holders of Claims and Interests ultimately would receive with respect to their Claims and Interests. If an alternative plan could not be agreed to, it is likely that, pursuant to the liquidation analysis attached hereto as Exhibit C, holders of Claims and Interests would receive less than they would have received pursuant to this Plan.

Any objection to the Plan by a member of a class of Claims or Interests could also either prevent Confirmation of the Plan or delay such Confirmation for a significant period of time.

#### (b)    *Other Bankruptcy Risks*

If Administrative Claims or Priority Claims are determined to be allowed in amounts greatly exceeding the Debtor's estimates, then there may be inadequate Cash or other property available on the Effective Date to pay such Claims under the Plan, and the Plan would not become effective. The Debtor believes, however, that it will have sufficient Cash to satisfy such Administrative and Priority Claims.

38

L.      **Exemption from Stamp or Similar Taxes.**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security or the making or delivery of any instrument of transfer under this Plan may not be taxed under any law imposing a stamp tax, use tax, sales tax or similar tax. Any sale of any Asset occurring before, after or upon the Effective Date, be deemed to be in furtherance of this Plan.

M.      **CONCLUSION**

THE DEBTOR URGES ALL CREDITORS AND PARTIES IN INTEREST TO STUDY THE DISCLOSURE STATEMENT AND TO REVIEW THE PLAN CAREFULLY, TO VOTE ON THE PLAN AND FILE THE BALLOT IN ACCORDANCE WITH THE INSTRUCTIONS ON THE ENCLOSED BALLOT.

Respectfully submitted this 30th day of June, 2010.

CASALE MARBLE IMPORTS, INC.

By: _____

D. Walter Casale, President

PAUL L. ORSHAN, P.A.
Counsel for Casale Marble
Imports, Inc.
2506 Ponce de Leon Boulevard
Coral Gables, Florida 33134
TEL:   305/529-9380
FAX:   305/402-0777
*paul@orshanpa.com*

By: _____

Paul L. Orshan, Esq.
Florida Bar No. 776203

*34*